# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

Appeal from the United States District Court
for the Northern District of Ohio

Case No. 08-3621

---

**OTTAWA TRIBE OF OKLAHOMA**, Appellant,

v.

**SEAN LOGAN, DIRECTOR, OHIO DEPARTMENT
OF NATURAL RESOURCES,** Appellee.

---

## BRIEF OF APPELLANT OTTAWA TRIBE OF OKLAHOMA

Richard D. Rogovin
Terrence M. Fay
FROST BROWN TODD LLC
10 West Broad Street, Suite 2300
Columbus, Ohio 43215
(614) 464-1234
(614) 464-1737 (facsimile)

Matthew C. Blickensderfer
FROST BROWN TODD LLC
2200 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
(513) 651-6162
(513) 651-6981 (facsimile)

*Attorneys for Appellant Ottawa Tribe of Oklahoma*

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

| | | |
|---|---|---|
| **OTTAWA TRIBE OF** | : | Case No. 08-3621 |
| **OKLAHOMA**, | : | |
| | : | |
| Appellant, | : | |
| | : | |
| v. | : | |
| | : | |
| **SEAN LOGAN, DIRECTOR,** | : | |
| **OHIO DEPARTMENT OF** | : | |
| **NATURAL RESOURCES,** | : | |
| | : | |
| Appellee. | : | |

      Pursuant to 6th Cir. R. 26.1, Appellant Ottawa Tribe of Oklahoma makes the

following disclosure:

1.     Is said party a subsidiary or affiliate of a publicly owned corporation?  **NO**

     If the answer is YES, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

2.     Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  **NO**

     If the answer is YES, list the identity of such corporation and the nature of the financial interest:

/s/ Matthew C. Blickensderfer              August 27, 2008
Matthew C. Blickensderfer                   Date

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST ............................................................................................i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES ................................................................iv

INTRODUCTION ..................................................................................1

STATEMENT IN SUPPORT OF ORAL ARGUMENT .........................1

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUES...........................................................2

STATEMENT OF THE CASE...............................................................2

STATEMENT OF FACTS .....................................................................3

SUMMARY OF ARGUMENT ..............................................................7

ARGUMENT .......................................................................................10

The Treaty of Greeneville granted the Ottawa Tribe fishing rights in the southwestern area of Lake Erie ..........................................11

The Treaty of Detroit reserved to the Ottawa Tribe fishing rights in the western basin of Lake Erie and confirmed their fishing rights elsewhere in Lake Erie ...................................................20

The Ottawas reserved fishing rights in the western basin of Lake The Treaty of Detroit reserved fishing rights for the Ottawas in Lake Erie ..................................................20

The Treaty of 1831 did not extinguish the fishing rights reserved by the Treaty of Detroit and did not affect any rights in the Treaty of Greeneville ...............................................23

The language of the Treaty of Detroit confirms that the Treaty of Greeneville reserved the southwestern portion of Lake Erie to the Indian tribes, including the Ottawas ..........................................28

The Treaty of Fort Industry did not extinguish the Ottawas' fishing rights reserved under the Treaty of Greenville ...............................................29

CONCLUSION ....................................................................................................31

CERTIFICATION OF COMPLIANCE ...................................................................33

CERTIFICATION OF SERVICE...........................................................................34

# TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                      <u>**PAGE**</u>

*Choctaw Nation v. Oklahoma*, 397 U.S. 620 (1970) .....................................9, 10, 18

*Factor v. Laubenheimer*, 290 U.S. 276 (1933) ........................................................17

*Grand Traverse Band of Ottawa and Chippewa Indians v. Director,*
   *Michigan Dep't of Natural Resources*, 141 F.3d 635 (6th Cir. 1998)...................9

*Jones v. Meehan*, 175 U.S. 1 (1899) ........................................................................10

*Keweenaw Bay Indian Community v. Naftaly*, 452 F.3d 514 (6th Cir.),
   *cert. denied*, 127 S. Ct. 680 (2006)........................................................... 9-10, 11

*Kimball v. Callahan*, 493 F.2d 564 (9th Cir. 1974)................................................11

*Massachusetts v. New York*, 271 U.S. 65 (1926) .....................................................18

*Menominee Tribe of Indians v. United States*, 391 U.S. 404 (1968)......................24

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
   526 U.S. 172 (1999)....................................................................... *passim*

*Pielage v. McConnell*, 516 F.3d 1282 (11th Cir. 2008) ..........................................17

*State v. Tinno*, 497 P.2d 1386 (Idaho 1972) ...........................................................12

*Strong v. United States*, 30 Ind. Cl. Comm. 8,
   *aff'd*, 521 F.2d 1406 (Cl. Ct. 1975) .................................................................30

*United States v. Dion*, 476 U.S. 734 (1986) ...........................................................12

## <u>TREATIES AND STATUTES</u>                           <u>PAGE</u>

25 U.S.C. § 861 .................................................................................6

28 U.S.C. § 1291 ...............................................................................2

28 U.S.C. §§ 1331 .............................................................................1

28 U.S.C. §§ 1362 .............................................................................1

Indian Removal Act, 4 Stat. 411 .......................................................5

Treaty of 1831, 7 Stat. 359......................................................... *passim*

Treaty of Detroit, 7 Stat. 105 ..................................................... *passim*

Treaty of Fort Industry, 7 Stat. 87.............................................. *passim*

Treaty of Greeneville, 7 Stat. 49................................................ *passim*

Treaty of Paris, 8 Stat. 80.............................................................14, 17

## INTRODUCTION

The Ottawa Tribe of Oklahoma sought a declaration recognizing its treaty-based rights to fish in Lake Erie.  Those rights have never been extinguished by subsequent treaty or Act of Congress.  A well-established and binding canon of construction requires that treaties with Indians be construed liberally in favor of the Indians.  While superficially nodding to this canon, the district court actually turned it on its head.  Rather than liberally construing these treaties for the Indians, the district court adopted parsimonious readings of the treaties to find that these rights had never been granted in the first place or that they had been extinguished. The district court's cramped interpretations cannot be squared with the language of the treaties, and its judgment should therefore be reversed.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

The Ottawa Tribe requests oral argument, which may assist the Court in interpreting the various treaties involved in this appeal.

## JURISDICTIONAL STATEMENT

Because this case arises under treaties of the United States and is brought by a federally recognized Indian tribe, the district court had subject matter jurisdiction under both 28 U.S.C. §§ 1331 and 1362.  This is an appeal from the final judgment entered on March 31, 2008.  The Ottawa Tribe filed a timely notice of appeal on

April 25, 2008.  This Court therefore has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Because the Treaty of Greeneville (1795) expressly established the international boundary between Canada and the United States (which ran through the middle of Lake Erie) as the upper boundary of the territory reserved to the Indians, did the trial court err in finding that that treaty did not reserve to the Ottawas fishing rights in Lake Erie?

2.      Because the Treaty of 1831 expressly limited its relinquishment of rights previously granted the Ottawas to those under the Treaty of Detroit (1807) and the Treaty of the Foot of the Rapids of the Miami River (1817), and because the Treaty of 1831 contains no express reference to fishing rights, did the trial court err in finding that the Treaty of 1831 extinguished fishing rights reserved to the Ottawas in prior treaties?

## STATEMENT OF THE CASE

The Ottawa Tribe filed a complaint seeking a declaratory judgment that, among other things, it had treaty-based rights to fish commercially in Lake Erie. Appellee Sean Logan, the Director of the Ohio Department of Natural Resources, moved for summary judgment solely on the ground that the Ottawa Tribe's claims were barred by various equitable defenses, such as laches, abandonment, and

waiver.    Director Logan affirmatively disclaimed any reliance on treaty interpretation as a basis for his summary judgment motion.    Memorandum in Support of Defendant's Motion for Summary Judgment on Laches and Abandonment ("the purpose of this motion is not to argue the merits of the treaty language"), Record Entry No. 69, pp. 2-3; ROA I pp. 376-377.

The district court, however, granted summary judgment on the very ground disclaimed by the movant.    And despite having denied a motion to dismiss making the same argument, the district court concluded that the Ottawa Tribe did not have any treaty-based right to fish in Lake Erie.    This timely appeal followed.

## STATEMENT OF FACTS

To facilitate westward expansion after the end of the Revolutionary War, the newly formed United States of America forced the various Indian tribes that occupied the lands between the Appalachians and the Mississippi River to enter into a series of treaties.    In these treaties, the Indians ceded what is now the heartland of the present United States, including the states of Michigan and Ohio. In return, the Indians were allowed to keep, if only for a short time, scattered reservations a minuscule fraction of the size of the lands they had ceded, and were allowed to continue to hunt and fish on the lands they had been forced to surrender. Even these scattered reservations were, for the most part, taken away from the tribes after Congress enacted the Indian Removal Act in 1830.

The case at bar is about what happened to the Ottawas. In the space of a scant 36 years, the Ottawas were forced to enter into a series of treaties with the United States, beginning with the Treaty of Greenville of 1795, 7 Stat. 49, and ending with the Treaty of 1831, 7 Stat. 359, by which they surrendered lands located within present day Michigan and Ohio – lands they had occupied for generations. Affidavit of Jerome Larry Angelo, Record Entry No. 87, p. 2; ROA I p. 501. This case concerns the right to fish in Lake Erie that was reserved to the Ottawas in these treaties.

The first of these treaties, the Treaty of Greeneville, was signed on August 3, 1795 at Greeneville, Ohio between the United States and several Indian tribes, including the Ottawas. Treaty of Greeneville, Record Entry No. 95, pp. 13-21; ROA II pp. 21-29. The treaty established a general boundary line between the Indians' lands and the United States' territories that ran generally southward about seventy miles from present-day Cleveland, and then generally westward across present-day Ohio. *Id.*, Art. 3. The Indian reserved the area to the north and west of this boundary and explicitly reserved usufructuary (*i.e.*, hunting and fishing) rights in this area. *Id.*, Art. 5.

In November of 1807, the United States entered another treaty with several Indian tribes, including the Ottawas, at Detroit. In this Treaty of Detroit, the Indians ceded a portion of northwest Ohio, a large section of eastern Michigan, and

4

an area in the western basin of Lake Erie.  Treaty of Detroit, Art. I, Record Entry No. 95, p. 29; ROA II p. 37.  The Indians again explicitly reserved usufructuary rights in the areas ceded by this treaty.  *Id.*, Art. V.

The Ottawas exercised the usufructuary rights conferred by various treaties, including the Treaty of Greeneville and the Treaty of Detroit, until most of them were forcibly removed from Ohio in the 1830s.  Deposition of Patrick Tucker, Record Entry No. 68, p. 127.  In 1830, Congress passed the Indian Removal Act, 4 Stat. 411, enacting a federal policy of removing Indians west of the Mississippi River to make way for white settlement.  *See* Expert Report of Helen Hornbeck Tanner, Record Entry No. 69, p. 43; ROA I p. 417; Affidavit of Jerome Larry Angelo ¶¶ 7, 9, Record Entry No. 87, p. 2; ROA I p. 501; Expert Report of Patrick Tucker, Record Entry No. 69, p. 46; ROA I p. 420.

Pursuant to the Indian Removal Act, the United States entered a treaty with the Ottawas in 1831 under which the most of the Ottawas would be removed west of the Mississippi River.  Treaty of 1831, 7 Stat. 359, Record Entry No. 95, pp. 50-58; ROA II pp. 58-66.  The Treaty of 1831 provided for a supposedly permanent reservation for the Indians in the Kansas Territory, which turned out to be decidedly temporary.  While the 1831 treaty explicitly provided that some Ottawas intended to stay in Ohio, most of the Ottawas were subjected to forced removals in 1832, 1837, and 1839.  Deposition of Larry Angelo, Record Entry No. 66, pp. 40,

90-91; Affidavit of Jerome Larry Angelo, Record Entry No. 87, p. 2; ROA I p. 501; Expert Report of Helen Hornbeck Tanner, Record Entry No. 69, p. 33; ROA I p. 407. Nearly half of the roughly 300 Ottawas who were removed died from disease and hunger within a few years. Affidavit of Jerome Larry Angelo, Record Entry No. 87, p. 2; ROA I p. 501.

Plaintiff Ottawa Tribe of Oklahoma is a federally recognized Indian tribe. 25 U.S.C. § 861. The Tribe is the successor in interest to the Ottawas whose representatives signed the various treaties on which this lawsuit is based. Affidavit of Jerome Larry Angelo, Record Entry No. 87, p. 1; ROA I p. 500. It includes descendants of the Ottawas who were removed from Ohio to Kansas, and who thereafter migrated from Kansas to Oklahoma. *Id.* at p. 2, ROA I p. 500. Defendant Sean Logan is Director of the Ohio Department of Natural Resources, a department of the State of Ohio that claims authority under Ohio statutes to regulate all fishing and hunting within the state.

## SUMMARY OF ARGUMENT

Because of the vastly unequal bargaining power between the Indians and the United States, it has long been the law that Indian treaties must be liberally construed in favor of the Indians. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 200 (1999). The district court failed to interpret the

applicable treaties in the Ottawas' favor and instead reached for implausible constructions that disfavored the Tribe.

Two treaties at issue – the Treaty of Greeneville and the Treaty of Detroit – reserved to the Ottawas fishing rights in portions of Lake Erie. *First*, in the Treaty of Greeneville, the United States relinquished its claims to all areas northward and westward of a treaty line running across Ohio. The treaty reserved to the Indians, including fishing rights, all of the territory to which the United States relinquished claims – a territory that included the southwestern portion of Lake Erie. The treaty plainly designated the international boundary between the United States and Canada as the upper border of the area reserved for the Indians and in which they reserved fishing rights. The international boundary runs through the middle of Lake Erie, so the area in which the Indians reserved fishing rights included the U.S. portion of Lake Erie. These fishing rights have not been extinguished by any subsequent treaty or act of Congress. The district court's interpretation – under which the Indians' retained area stops at the shore of Lake Erie – cannot be squared with the treaty's reference to the international boundary.

*Second*, in the Treaty of Detroit, the Ottawas ceded the western part of that portion of Lake Erie that had been reserved for them in the Treaty of Greeneville. The district court's interpretation of the Treaty of Greeneville – under which the Indians' retained area stopped at the shore of Lake Erie – cannot be squared with

7

the cession in the Treaty of Detroit of part of Lake Erie. If the district court were correct, the Ottawas would have had no territory in Lake Erie to cede, and yet they plainly did so in the Treaty of Detroit.

Having ceded part of Lake Erie, however, the Ottawas explicitly reserved fishing rights there and in other parts of the ceded territory. The district court agreed, but erred in finding that the Treaty of 1831 subsequently extinguished these rights. Indian treaty rights can be extinguished with only the clearest and most explicit of language. The Treaty of 1831 contained no such clear and explicit language extinguishing the Ottawas' fishing rights memorialized in the Treaty of Detroit. Indeed, the language of the Treaty of 1831 is indistinguishable from language the Supreme Court found insufficient to extinguish treaty rights. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 195 (1999).

In any event, the Treaty of 1831 did not purport to affect the rights reserved by the Ottawas in the Treaty of Greeneville. Even if the district court were correct that the Treaty of 1831 extinguished the rights in the Treaty of Detroit, the fishing rights from the Treaty of Greeneville remained intact.

In the Treaty of Fort Industry (1805), 7 Stat. 87, the Ottawas ceded lands south of Lake Erie. If the Treaty of Fort Industry did not encompass any part of Lake Erie (as the Ottawas contend), it is irrelevant to the Ottawas' right to fish in that lake. The district court did not rule on the geographic scope of the Treaty of

8

Fort Industry.  It did, however, erroneously hold that this treaty extinguished the Ottawas' fishing rights in the ceded lands – whatever their scope.

The relevance of that erroneous holding depends on whether or not the Treaty of Fort Industry encompassed any part of Lake Erie.  And the district court has not yet ruled on that issue.  The Ottawa Tribe therefore respectfully suggests that the interpretation of the Treaty of Fort Industry is not ripe for this Court's determination.  Nonetheless, the Ottawas raise that issue here to avoid any argument that it has been waived and to preserve both of its arguments with respect to the Treaty of Fort Industry: (1) the treaty did not encompass any part of Lake Erie and, in the alternative, (2) the treaty did not extinguish any treaty-based fishing rights.

## ARGUMENT

It is well settled that "Indian treaties are to be interpreted liberally in favor of the Indians . . . and [ ] ambiguities are to be resolved in their favor . . . ." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 200 (1999) (citations omitted); *Grand Traverse Band of Ottawa and Chippewa Indians v. Director, Michigan Dep't of Natural Resources*, 141 F.3d 635, 639 (6th Cir. 1998). Any "doubtful expressions" should be construed to favor the Indians.  *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631 (1970); *Keweenaw Bay Indian Community*

9

*v. Naftaly*, 452 F.3d 514, 523(6th Cir.) (citation and quotation omitted), *cert. denied*, 127 S. Ct. 680 (2006).

The rationale for this rule of liberal construction is that, when they signed treaties with the United States, the Indians were "a weak and dependent people, who ha[d] no written language . . . and whose only knowledge of the terms in which the treaty [wa]s framed [wa]s that imparted to them by the interpreter employed by the United States . . . ." *Jones v. Meehan*, 175 U.S. 1, 11 (1899). That rationale applies in full to these treaties. The Ottawas did not read or speak English and had to have the treaties at issue explained to them by government translators. Affidavit of Jerome Larry Angelo, Record Entry No. 87, p. 2; ROA I p. 501.

Consequently, treaties must be interpreted as the *Indians* would have understood them, not as legal or technical meanings or dictionary definitions might otherwise dictate. *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631 (1970); *see also Mille Lacs Band of Chippewa Indians*, 526 U.S. at 196 (treaties are interpreted "to give effect to the terms as the Indians themselves would have understood them."). And to interpret treaties as the Indians would have understood them, courts must look "beyond the written words to the larger context that frames the Treaty, including the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Id*.

The district court erred by misinterpreting the language of relevant treaties that conferred fishing rights on the Ottawas and that extinguished some (but not all) of the Ottawas' treaty-based rights.  The district court compounded that error by *denying* the Ottawa Tribe the benefit of the doubt in construing the treaties as it did.  Because this Court reviews summary judgments *de novo* and because treaty interpretation is a question of law, no deference is due the district court. *Keweenaw Bay Indian Cmty. v. Naftaly*, 452 F.3d 514, 521  (6th Cir.), *cert. denied*, 127 S. Ct. 680 (2006).

## I.    The Treaty of Greeneville granted the Ottawa Tribe fishing rights in the southwestern area of Lake Erie.

In August of 1795, the Ottawas and other tribes entered a treaty with the United States at Greeneville, Ohio.  In this treaty, the Indians and the United States agreed upon a boundary line between the Indians' lands and the United States' territories that ran generally southward from present day Cleveland and then generally westward across present-day Ohio.  The Indians reserved the lands and waters to the north and west of this boundary, including the southwestern portion of Lake Erie.   The treaty explicitly reserved usufructuary (*i.e.*, hunting and

11

fishing) rights for the Indians in the lands retained by them.[1]    Treaty of Greeneville, Art. 5, Record Entry No. 95, pp. 16-17; ROA II pp. 24-25.

Specifically, the treaty established the line between Indian and U.S. lands as follows:

> The general boundary line between the lands of the United States and the lands of the said Indian tribes shall begin at the mouth of the Cayahoga River, and run thence up the same to the portage, between that and the Tuscarawas branch of the Muskingum, thence down that branch to the crossing place above fort Lawrence, thence westerly to a fork of that branch of the Great Miami river, running into the Ohio, at or near which fork stood Loromie's store, and where commences the portage between the Miami of the Ohio, and St. Mary's river, which is a branch of the Miami which runs into lake Erie; thence a westerly course to fort Recovery, which stands on a branch of the Wabash; thence southwesterly in a direct line to the Ohio, so as to intersect that river opposite the mouth of Kentucke or Cuttawa river.   And in consideration of the peace now established; of the goods formerly received from the United States; of those now to be delivered; and of the yearly delivery of goods now stipulated to be made hereafter; and to indemnify the United States for the injuries and expenses they have sustained during the war, the said Indian tribes do hereby cede and relinquish forever, all their claims to the lands lying eastwardly and southwestwardly of the general boundary line now described:  and these lands, or any part of them, shall never hereafter be made a cause or pretence, on the part of the said tribes, or any of them, of war or injury to the United States, or any of the people thereof.

---

[1] Although the treaty refers specifically to the right to hunt, courts have construed treaty references to hunting to include fishing and *vice versa*. *Kimball v. Callahan*, 493 F.2d 564, 566 (9th Cir. 1974); *State v. Tinno*, 497 P.2d 1386, 1390 (Idaho 1972).  In any event, usufructuary rights are impliedly reserved for the Indians in the areas reserved to them in treaties unless they are clearly relinquished by treaty or clearly modified by Congress.  *United States v. Dion*, 476 U.S. 734, 738 (1986) ("These rights need not be expressly mentioned in the treaty.").

Treaty of Greeneville, Art. 3, Record Entry No. 95, pp. 14-15; ROA II pp. 22-23.

The treaty line is illustrated in the following map[2]:



The United States relinquished all claims to the lands and waters to the north

of the Greeneville treaty line up to the international border with Canada (except for

a few defined tracts of land):

    In consideration of the peace now established, and of the cessions and
    relinquishments of lands made in the preceding article by the said

---

[2] This map is offered only as an aide to the Court.  It is reproduced from Wiley
Sword, *President Washington's Indian War: The Struggle for the Old Northwest,
1790-1795* (University of Oklahoma Press 1985), p. 322.

tribes of Indians, and to manifest the liberality of the United States, as the great means of rendering this peace strong and perpetual, the United States relinquish their claims to all other Indian lands northward of the river Ohio, eastward of the Mississippi, and westward and southward of the Great Lakes and the waters, uniting them, *according to the boundary line agreed on by the United States and the King of Great Britain, in the treaty of peace made between them in the year 1783.*

Treaty of Greeneville, Art. 4 (emphasis added).

The reference to the 1783 treaty is to the Treaty of Paris, which ended the Revolutionary War and established the international boundary between the United States and Canada, then known as British North America. The international boundary established by the Treaty of Paris ran through the "middle of" Lake Erie:

And that all disputes which might arise in future on the subject of the boundaries of the said United States may be prevented, it is hereby agreed and declared, that the following are and shall be their boundaries, viz.; from the northwest angle of Nova Scotia, viz.; that nagle which is formed by a line drawn due from the source of St. Croix River to the highlands; along the said highlands which divide those rivers that empty themselves into the river St. Lawrence, from those which fall into the Atlantic Ocean, to the northwesternmost head of Connecticut River; thence down along the middle of that river to the forty-fifth degree of north latitude; from thence by a line due west on said latitude until it strikes the river Iroquois or Cataraquy; thence along the middle of said river into Lake Ontario; through the middle of said lake until it strikes the communication by water between that lake and Lake Erie; thence along the middle of said communication *into Lake Erie, through the middle of said lake until it arrives at the water communication between that lake and Lake Huron . . . .*

Treaty of Paris, Art. 2, 8 Stat. 80 (emphasis added). The Treaty of Greeneville's reference to the international border in the middle of Lake Erie can only be

14

understood as upper boundary of the lands and waters being retained by the Indians under the treaty.

The district court concluded, however, that the scope of the lands and waters granted to the Indians by the Treaty of Greeneville did not extend into Lake Erie. Its reasoning cannot be squared with the canons of construction for Indian treaties.

*First*, the district court found that the treaty's language *implied* "a separation between Lake Erie and the surrounding shore" and that only the latter was retained by the Indians. The district court relied on the treaty's grant to the United States of "the free use of the harbors and mouths of rivers along the lakes adjoining the Indian lands, for sheltering vessels and boats, and liberty to land their cargoes where necessary for their safety." The district court concluded that because the lakes "adjoin[ed]" the "Indian lands," the lakes could not be part of what the Indians retained.

This overly technical construction is inconsistent with both applicable canons of treaty constructions as well as the treaty language itself. Rather than interpreting the treaty liberally in favor of the Indians, the district court relied on an *implication* of treaty language that is far from obvious. And the district court's interpretation is questionable (at best) in the light of the *entirety* of the passage relied on by that court:

> And the said Indian tribes will allow to the people of the United States a *free passage by land and by water*, as one and the other shall be

found convenient, through their country, along the chain of posts hereinbefore mentioned; that is to say, from the commencement of the portage aforesaid, at or near Loromie's store, thence along said portage to the St. Mary's, and down the same to fort Wayne, and then down the Miami, to lake Erie; again, from the commencement of the portage at or near Loromie's store along the portage from thence to the river Auglaize, and down the same to its junction with the Miami at fort Defiance; again, from the commencement of the portage aforesaid, to Sandusky river, and down the same to Sandusky bay and lake Erie, and from Sandusky to the post which shall be taken at or near the foot of the Rapids of the Miami of the lake; and from thence to Detroit.... And the said Indian tribes will also allow to the people of the United States, the free use of the harbors and mouths of rivers along the lakes adjoining the Indian lands, for sheltering vessels and boats, and liberty to land their cargoes where necessary for their safety.

Treaty of Greeneville, Art. 3 (emphasis added), Record Entry No. 95, pp. 14-15; ROA II pp. 22-23.

A "free passage . . . by water" between several of the places mentioned in the passage could occur only through Lake Erie. For instance, traveling by water from Sandusky to "the post . . . at or near the foot of the Rapids of the Miami of the lake" would require travel on Lake Erie. Similarly, traveling by water "from [the latter fort] to Detroit" would require travel on Lake Erie to reach the Detroit River. The fact that some of the specified routes for which the Indians granted "free passage" involved travel on Lake Erie indicates that the lake was reserved for the Indians. This construction is unavoidable unless the treaty's signatories did not mean what they said when they established "free passage" rights by land *and water* between the various locations listed.

16

Furthermore, the district court's construction renders the Treaty of Greeneville's reference to the international border a nullity. Under the district court's strained construction, the area retained by the Indians ended at the shore of Lake Erie – even though the treaty's drafters could have easily said so if that is what they intended. But the treaty clearly references the Treaty of Paris's boundary – which ran through the "middle of" Lake Erie – in defining the scope of the area retained by the Indians. An interpretation that ignores the use of the international border in defining the Indians' rights violates the well known canon requiring interpretation of all parts of an agreement without rendering any part a nullity. *E.g.*, *Factor v. Laubenheimer*, 290 U.S. 276, 303-04 (1933); *Pielage v. McConnell*, 516 F.3d 1282, 1288 (11th Cir. 2008).

The district court's error in this regard was relying on what it perceived to be the *implication* of Article 3 of the treaty as a way of defining the upper boundary of the territory reserved by the Indians. But that boundary is not defined by Article 3 at all; it is explicitly defined by Article 4 of the treaty. And Article 4 of the treaty plainly says that the upper boundary of the Indians' territory was the international boundary in the "middle of" Lake Erie.

*Second*, the district court applied a presumption against a sovereign's alienation of navigable waterways that has absolutely no relevance in this context. The Supreme Court articulated a narrow presumption against such alienation in

17

*Massachusetts v. New York*, 271 U.S. 65 (1926), a boundary dispute between states that had nothing to do with interpretation of Indian treaties. The Court did not suggest any rule that the United States retained title to navigable waterways within areas retained by Indian peoples – and any such suggestion would have been inconsistent with scores of cases interpreting Indian treaties.

Moreover, the district court's use of this inapplicable presumption is entirely divorced from the Treaty of Greeneville's historical context. The treaty was an attempt to end years of competing claims among white settlers and Indians in the Northwest Territory by creating a line between Indian and white areas. Lake Erie was among the areas the Indians used and claimed. Under the district court's interpretation of the treaty, the Indians relinquished that claim (and their usage of the lake for fishing) without so much as a single word in the treaty. A presumption against a sovereign's alienation of navigable waters might make sense when one sovereign clearly owns those waters. But it makes no sense in interpreting a treaty the very of point of which was to settle competing claims of sovereignty and dominion.

In any event, the district court's reliance on this inapplicable presumption is contrary to later Supreme Court authority. In *Choctaw Nation v. Oklahoma*, 397 U.S. 620 (1970), the Supreme Court rejected an argument that an Indian treaty should be interpreted so as to exclude navigable waters from the grant to the

Indians. "[I]t seems well settled," the Court held, "that the United States can dispose of lands underlying navigable waters just as it can dispose of other public lands." *Id.* at 633. The only question, the Court found, was whether the metes and bounds description of lands reserved to the Indians included the navigable waterway. Because it did, and because there was no "express exclusion" of the waterway, the Court held that the navigable waterway was retained by the Indians. *Id.* at 634.

The result should be no different here. The Treaty of Greeneville's description of the area reserved to the Indians includes all of southwestern Lake Erie, and there is no "express exclusion" of the lake. The district erred in concluding that the Treaty of Greeneville did not reserve the Ottawas' fishing rights in Lake Erie.

## II. The Treaty of Detroit reserved to the Ottawa Tribe fishing rights in the western basin of Lake Erie and confirmed their fishing rights elsewhere in Lake Erie.

### A. The Ottawas reserved fishing rights in the western basin of Lake The Treaty of Detroit reserved fishing rights for the Ottawas in Lake Erie.

In Detroit in November of 1807, the Ottawas and other Indian tribes entered a treaty with the United States under which the Indians ceded portions of northwestern Ohio and a large portion of eastern Michigan. The Treaty of Detroit described this cession as follows:

Beginning at the mouth of the Miami river of the lakes, and running thence up the middle thereof, to the mouth of the great Au Glaize river, thence running due north, until it intersects a parallel of latitude, to be drawn from the outlet of lake Huron, which forms the river Sinclair; thence running north east the course, that may be found, will lead in a direct line, to White Rock, in lake Huron, *thence due east, until it intersects the boundary line between the United States and Upper Canada, in said lake, thence southwardly, following the said boundary line, down said lake, through river Sinclair, lake St. Clair, and the river Detroit, into lake Erie, to a point due east of the aforesaid Miami river, thence west to the place of beginning.*

Treaty of Detroit, Art. I, Record Entry No. 95, p. 29; ROA II p. 37 (emphasis added). The cession corresponds to the green areas numbered 66 in the following maps of Ohio and Michigan.[3]

---

[3] The maps are reproductions from the federal publication, Charles C. Royce, *Indian Land Cessions in the United States, 1784-1894*. The maps are available online at the Library of Congress' web site, http://lcweb2.loc.gov/cgi-bin/query/r?ammem/gmd:@field(NUMBER+@band(g3701em+gct00002)).



21



The cession plainly included a portion of the western basin of Lake Erie, and the treaty explicitly reserved to the Indians the right to fish there: "[i]t is further agreed and stipulated, that the said Indian nations shall enjoy the privilege of hunting and fishing on the lands ceded as aforesaid, as long as they remain the property of the United States."  Treaty of Detroit, Art. V, Record Entry No. 95, p.

30; ROA II p. 38.   The district court correctly held that the Treaty of Detroit

granted fishing rights to the Ottawas in the specified portion of Lake Erie.[4]

> **B.**    **The Treaty of 1831 did not extinguish the fishing rights reserved by the Treaty of Detroit and did not affect any rights in the Treaty of Greeneville.**

The district court erroneously concluded, however, that these fishing rights

were extinguished by a subsequent compact, the Treaty of 1831.   That treaty is

introduced as follows:

> Articles of agreement and convention made and concluded this thirtieth day of August, in the year of our Lord one thousand eight hundred and thirty-one, by and between James B. Gardiner, specially appointed commissioner on the part of the United States, on the one part, and the chiefs, head men and warriors of the band of Ottoway Indians residing within the State of Ohio on the other part, for a cession of the several tracts of land now held and occupied by said Indians within said State, *by reservations made under the treaty concluded at Detroit on the 17th day of November, 1807, and the treaty made at the foot of the rapids of the Miami river of Lake Erie, on the 29th of September, 1817.*

Treaty of 1831, Record Entry No. 95; ROA II p. 59 (emphasis added).   The district

court relied on a provision stating that "[o]n the ratification of this convention, the

---

[4] The district court correctly held that the qualification "as long as [the lands and waters] remain the property of the United States" was a reference not to fee simple title, but to territorial sovereignty.   The area encompassed by the Treaty of Detroit was subject to an international boundary dispute between the United States and Great Britain that was not resolved until the conclusion of the War of 1812.   Thus, the fishing rights in Lake Erie were to continue as long as the part of Lake Erie in question remained within the territorial jurisdiction of the United States.

privileges of every description, granted to the Ottaway nation within the State of Ohio, by the treaties under which they hold the reservations of land herein ceded, shall forever cease and determine." Treaty of 1831, Art. 17, Record Entry No. 95, p. 55; ROA II p. 63. The only two treaties under which the Ottawas held reservations ceded in the Treaty of 1831 were the treaties mentioned in the introductory clause: "the treaty concluded at Detroit on the 17th day of November, 1807, and the treaty made at the foot of the rapids of the Miami river of Lake Erie, on the 29th of September, 1817."

Because the Treaty of Greeneville is not one of the two treaties referenced in the Treaty of 1831, the latter treaty had no effect whatsoever on the Ottawas' fishing rights in Lake Erie under the Treaty of Greeneville. So, whatever may be said about the effect of the Treaty of 1831 on the fishing rights reserved in the Treaty of Detroit, it is clear that the fishing rights reserved to the Ottawas under the Treaty of Greeneville survived.

With respect to the Treaty of Detroit, the district court erred in its conclusion that the Ottawas surrendered the fishing rights they reserved in that treaty when they signed the Treaty of 1831. Indians' treaty rights can be abrogated only with the clearest of language. *Mille Lacs Band of Chippewa Indians*, 526 U.S. 172; *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 413 (1968) "the intention to abrogate or modify a treaty is not to be lightly imputed to Congress")

(quotation and citation omitted). And the language in the Treaty of 1831 did not clearly abrogate the fishing rights reserved by the Treaty of Detroit. In *Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, the Supreme Court rejected an argument that the Indians had, by a subsequent treaty, relinquished their hunting and fishing rights. The subsequent treaty stated that "the said Indians do further fully and entirely relinquish and convey to the United States, any and all right, title, and interest, of whatsoever nature the same may be, which they may now have, in, and to any other lands in the Territory of Minnesota or elsewhere." *Id*. at 184.

The Supreme Court held that this language did not extinguish hunting and fishing rights because those rights were not explicitly mentioned in the subsequent treaty. *Id*. at 195. The omission, the Court held, was "telling because the United States treaty drafters had the sophistication and experience to use express language for the abrogation of treaty rights." *Id*. At a minimum, the Court held, the subsequent treaty was ambiguous, and therefore to be construed in favor of the Indians. *Id*. at 200. The Court thus required an explicit reference to previously granted fishing rights to extinguish those rights.

Here the Treaty of 1831 contains no explicit mention of the Tribe's fishing rights. That treaty's drafters were sophisticated enough to have employed express language to abrogate those rights if they had so chosen. The omission must be construed in favor of the Ottawas.

The district court nonetheless held that the language at issue here ("the privileges of every description, granted to the Ottaway nation within the State of Ohio . . . shall forever cease and determine") is somehow more specific than the language in *Mille Lacs* ("any and all right, title, and interest, of whatsoever nature the same may be, which they may now have, in, and to any other lands in the Territory of Minnesota or elsewhere").   The district court found that the phrase "of whatsoever nature the same may be" in *Mille Lacs* created an ambiguity that is not present in the Treaty of Detroit's language.   But how is the qualifying phrase "of every description" any different from the qualifying phrase "of whatsoever nature the same may be?"   Both seem intended to extend the phases they qualify to the fullest extent.   The district court offered no explanation of any difference, and it is difficult to imagine what the perceived difference might be.   This is a distinction without a difference, and a poor justification for construing Treaty of 1831 *against* the Ottawas.

Furthermore, the only "privileges" the Treaty of 1831 purported to extinguish were those "within the State of Ohio."   Treaty of 1831, Art. 17, Record Entry No. 95, p. 55; ROA II p. 63.   There is no support for the district court's implicit assumption that the Indians signing that the Treaty would have understood their Lake Erie fishing rights to be "within the State of Ohio."   The district court's interpretation ascribes to the Indians a keen understanding of the territorial

jurisdiction of the United States and its various states – an ascription that cannot be reconciled with the requirement that treaties be interpreted as the Indians would have understood them.

Finally, construing the Treaty of 1831 to extinguish the usufructuary rights granted by the Treaty of Detroit makes little sense given the overall purpose of the Treaty of 1831. *See Mille Lacs Bank of Chippewa Indians*, 526 U.S. at 196 (using a treaty's purpose and context to reject an argument that the treaty extinguished usufructuary rights). The Treaty of 1831 effected the removal of *some* Ottawas from Ohio and provided for a "permanent" reservation (which turned out to be temporary) west of the Mississippi River. But the treaty explicitly acknowledged that some Ottawas refused to leave Ohio and, while acceding to that refusal, the United States offered inducements in the treaty for the remaining Ottawas to leave Ohio at a later date. Treaty of 1831, Arts. 2 and 11, Record Entry No. 95, pp. 51-52 and 52; ROA II pp. 59-60 and 61. It makes no sense for the Ottawas who chose to remain in Ohio to have given up their usufructuary rights, which were their traditional means of subsistence. Under the district court's interpretation, the Treaty of 1831 would have both allowed some Ottawas to remain in Ohio while denying them the means to subsist. That interpretation simply cannot be correct.

Thus, the Treaty of 1831 did not in any way purport to extinguish the right to fish in Lake Erie reserved to the Ottawas under the Treaty of Greeneville.

Moreover, the Treaty of 1831 did not include the kind of clear, explicit abrogation of fishing rights required to extinguish the right to fish reserved to the Ottawas in the Treaty of Detroit. The overall treaty language and the historical context are inconsistent with such an extinguishment. The district court erred in concluding otherwise.

### C.    The language of the Treaty of Detroit confirms that the Treaty of Greeneville reserved the southwestern portion of Lake Erie to the Indian tribes, including the Ottawas.

In addition to reserving fishing rights in an area ceded by the Indians, the Treaty of Detroit implicitly confirms that the Ottawas' interpretation of the Treaty of Greeneville is correct. The Treaty of Detroit indicates that the Treaty of Greeneville had, in fact, reserved the southwestern part of Lake Erie to the Indians.

The area ceded by the Ottawas in the Treaty of Detroit unquestionably included a portion of the western basin of Lake Erie. That conclusion follows from the description of what the Indians ceded, the eastern boundary of which "follow[ed] the said [international] boundary line, down said lake [Lake Huron], through river Sinclair, lake St. Clair, and the river Detroit, into lake Erie, to a point due east of the aforesaid Miami [now Maumee] river, thence west to the place of beginning." Treaty of Detroit, Art. I, Record Entry No. 95, p. 29; ROA II p. 37.

If the Ottawas ceded a portion of Lake Erie in the 1807 Treaty of Detroit, that meant that they must have held that portion previously. And the reason they

held that portion previously is because it was part of what the Treaty of Greeneville had reserved to them. If, as the district court believed, the Treaty of Greeneville established the boundary of Indian lands at the shore of Lake Erie, there would have been no need for the cession included in the Treaty of Detroit to include part of Lake Erie. Under the district court's interpretation, the Ottawas ceded something that did not have in the first place. That interpretation makes no sense – because the district court's interpretation of the Treaty of Greeneville was in error. As confirmed by the Treaty of Detroit, the Treaty of Greeneville reserved the southwestern portion of Lake Erie to the Ottawas. The fishing rights for that area of the lake have never been extinguished.

## III.    The Treaty of Fort Industry did not extinguish the Ottawas' fishing rights reserved under the Treaty of Greenville.

The district court also misconstrued the Treaty of Fort Industry (1805), 7 Stat. 87, to have extinguished the Ottawas' fishing rights in that part of the Greenville Treaty area just south of Lake Erie. That treaty – actually two compacts signed with the United States on the same day in the same place – did not contain the kind of clear and unambiguous language required to extinguished treaty-based usufructuary rights. On the contrary, the second of the two treaties signed that day incorporated the first treaty by reference and immediately thereafter expressly stated that the Indians "shall be at liberty to fish and hunt within the territory and lands which they have now ceded to the United States." Treaty of Fort Industry,

Art. VI, Record Entry No. 95, p. 28; ROA p. 32.  The Indians would have naturally understood that they were ceding the land covered by both treaties to the United States, even though the government's purpose in one of the compacts was to transfer land to a private company.  After all, only ten years earlier the Indians had entered into the Treaty of Greeneville, under which their territory could be sold only to the United States.[5]  The Indians would therefore have understood that they were at liberty to hunt and fish in all of the areas encompassed by the Treaty of Fort Industry.

The district court's ruling on the Treaty of Fort Industry's effect on usufructuary rights is potentially relevant *if* that treaty encompasses any part of Lake Erie.  It does not.  The treaty refers to the land at issue as "south of the shore of lake Erie . . . ."  Treaty of Fort Industry, Record Entry No. 95, p. 30; ROA p. 34. And the federal government's former adjudicatory body for Indian land claims, the Indian Claims Commission, confirmed this interpretation, holding that the treaty area's northern border was Lake Erie.  *Strong v. United States*, 30 Ind. Cl. Comm. 8, 10, *aff'd*, 521 F.2d 1406 (Cl. Ct. 1975).

---

[5] "[W]hen those tribes, or any of them, shall be disposed to sell their lands, or any part of them, they are to be sold only to the United States; and until such sale, the United States will protect all the said Indian tribes in the quiet enjoyment of their lands against all citizens of the United States, and against all other white persons who intrude upon the same."  Treaty of Greeneville, Art. 5, Record Entry No. 95, pp. 13-21; ROA II pp. 24-25.

The district court ruled that that geographic scope of the Treaty of Fort Industry was "moot" because of its holding that the Ottawas never had fishing rights in Lake Erie in the first place. In the district court's view, there was no need to determine whether the Treaty of Fort Industry extinguished a right the district court did not believe existed anyway.

But because the Ottawas *did* reserve fishing rights in Lake Erie in the Treaty of Greeneville, the Treaty of Fort Industry's geographic scope and its effect on fishing rights – both disputed issues – could become relevant. Although the Ottawas respectfully suggest that these issues are not ripe given the posture of this appeal, they raise them here to avoid any contention that they failed to preserve their arguments as to the proper interpretation of the Treaty of Fort Industry.

## CONCLUSION

The district court erred in interpreting the Treaty of Greeneville so as to exclude Lake Erie and therefore not to have granted fishing rights on that lake to the Ottawas. The district court furthered erred in finding that the Treaty of 1831 extinguished fishing rights granted to the Ottawas by the Treaty of Detroit. Finally, the district court erred in finding that the Treaty of Fort Industry extinguished the Ottawas' fishing rights in the territory immediately south of Lake Erie that had been reserved in the Treaty of Greeneville. The judgment should be

reversed and this action should be remanded with instructions to proceed to trial on the Ottawa Tribe's claims.

Respectfully submitted,

/s/ Terrence M. Fay
Richard D. Rogovin
Terrence M. Fay
FROST BROWN TODD LLC
10 West Broad Street, Suite 2300
Columbus, Ohio 43215
(614) 464-1234
(614) 464-1737 (facsimile)

/s/ Matthew C. Blickensderfer
Matthew C. Blickensderfer
FROST BROWN TODD LLC
2200 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
(513) 651-6162
(513) 651-6981 (facsimile)

*Attorneys for Appellant Ottawa Tribe of Oklahoma*

## <u>CERTIFICATION OF COMPLIANCE</u>

I hereby certify that this Brief of Appellant Ottawa Tribe of Oklahoma complies with the type-volume limitation of Fed. R. App. P. 32(a)(7). Excluding the corporate disclosure statement, table of contents, table of authorities, statement in support of oral argument, certification of compliance, and certification of service, this brief contains 7,224 words.

/s/ Matthew C. Blickensderfer

## CERTIFICATION OF SERVICE

I hereby certify that on this 27th day of August, 2008, I electronically filed the Brief of Appellant Ottawa Tribe of Oklahoma with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered counsel, and further served the brief by ordinary U.S. mail on the following counsel of record:

Damian W. Sikora
Office of the Attorney General
State of Ohio
30 East Broad Street, 17th Floor
Columbus, OH 43215

Peggy W. Corn
Office of the Attorney General
State of Ohio
30 East Broad Street, 17th Floor
Columbus, OH 43215

Sharon A. Jennings
Office of the Attorney General
State of Ohio
30 East Broad Street, 17th Floor
Columbus, OH 43215

Richard N. Coglianese
Office of the Attorney General
State of Ohio
30 East Broad Street, 17th Floor
Columbus, OH 43215

/s/ Matthew C. Blickensderfer

CINLibrary 0114939.0559219 1867728v.4